57 CCPA

Phil E. WEISS (deceased) by Mildred L. Weiss, Administratrix, and Abraham M. Reiter, Appellant,

v.

Erwin M. ROSCHKE, Appellee.

Erwin M. ROSCHKE, Appellant,

v.

Phil E. WEISS (deceased) by Mildred L. Weiss, Administratrix, and Abraham M. Reiter, Appellee.

Patent Appeal Nos. 8290, 8322.

United States Court of Customs and Patent Appeals.

May 14, 1970.

Rehearing Denied July 30, 1970.

Samuel Lindenberg, Los Angeles, Cal., attorney of record, for appellants and cross-appellee.

Dugald S. McDougall, Francis W. Crotty, John J. Pederson, Chicago, Ill., Homer

R. Montague, Washington, D. C., for appellee and cross-appellant.

Before RICH, Acting Chief Judge, ALMOND, BALDWIN and LANE, Associate Judges, and ROSENSTEIN, Judge, United States Customs Court, sitting by designation.

ALMOND, Judge.

These are cross appeals from the decision of the Board of Patent Interferences in Interference No. 94,050 involving Roschke patent No. 3,011,016, issued November 28, 1961 on an application filed June 29, 1959, and Weiss et al. (Weiss) application serial No. 219,375 for reissue of a patent [1] issued on an application filed June 16, 1958, on counts copied from the Roschke patent by Weiss. The board awarded twelve of the counts to Roschke and Weiss appeals (No. 8290) as to ten of them, counts 1, 2, 6–9, 11–13 and 16. Two other counts, 15 and 17, were awarded to Weiss, and Roschke appeals (No. 8322) as to both of them.

Neither party took testimony. Weiss relies solely on his effective filing date, which is the date he filed the application that resulted in the patent which he seeks to reissue. Roschke contends that the Weiss application does not support the counts and further, that if any counts are interpreted so broadly as to be supported by Weiss, they are also supported by Roschke patent No. 3,107,274, issued October 15, 1963 on an application filed December 31, 1954, earlier than Weiss's effective date.

The invention in issue relates to a receiver for use in a subscription television system. Such a system contemplates that the programs be transmitted over the air on an assigned channel but in a coded condition so as not to produce either picture or sound intelligibly on a regular receiver tuned to the channel. A subscriber's receiver is provided with an attachment which, when adjusted in accordance with instructions for each program and action is taken to insure payment of the fee established for the program, decodes the received signals to cause the receiver to reproduce the program.

Counts 6, 8, 15 and 17 may be considered representative:

6. A subscription receiver for utilizing an intelligence signal coded in accordance with a given coding schedule comprising: a signal reproducer; a decoding mechanism for controlling said reproducer in accordance with said signal and including a plurality of adjustable code-determining elements collectively determining the decoding schedule of said mechanism; means for adjusting said code-determining elements to vary the decoding schedule of said mechanism; means for applying said intelligence signal to said decoding mechanism; means for effectively comparing the decoding schedule of said mechanism to said coding schedule of said intelligence signal to derive a control effect representing the state of correlation of said schedules; and means for utilizing said control effect to permit said reproducer to operate only during intervals of correct correlation of said schedules.

8. A secrecy communication receiver comprising: means for deriving a code signal having a characteristic representing a given code pattern; decoding apparatus coupled to said deriving means and including a plurality of adjustable code-determining elements to be adjusted relative to one another in accordance with said code pattern; means for effectively comparing the instantaneous adjustment of said code-determining elements with said code pattern to derive a control effect indicating the correlation status therebetween; a signal-translating device having a plurality of operating conditions, a predetermined one of which conditions represents a correct correlation status between the adjustment of said code-determining elements and said code pattern; and means for utilizing said control effect

---

1. Patent No. 3,001,011, issued September 19, 1961.

to actuate said signal-translating device to said predetermined operating condition in response to a condition of correct correlation.

15. A secrecy communication receiver for utilizing an intelligence signal, comprising: means for deriving a code signal having a characteristic representing a given code pattern; decoding and reproducing means, including a plurality of adjustable code-determining elements to be adjusted relative to one another in accordance with said code pattern, for responding to said code signal and for intelligibly reproducing said intelligence signal; means for effectively comparing the instantaneous adjustment of said code-determining elements with said code pattern to derive a control effect indicating the correlation status therebetween; and means for utilizing said control effect to condition said decoding and reproducing means, only during intervals of correct correlation between the adjustment of said code-determining elements and said code pattern, to achieve intelligible reproduction of said intelligence signal.

17. A secrecy communication receiver comprising: signal-generating apparatus, including a plurality of adjustable code-determining elements to be adjusted in accordance with a predetermined adjustment, for developing a comparison signal having a characteristic determined, at least in part, by the instantaneous adjustment of said code-determining elements; means responsive to said comparison signal for effectively comparing the instantaneous adjustment of said code-determining elements with said predetermined adjustment to derive a control effect indicating the correlation status therebetween; a signal reproducer; and means for utilizing said control effect to effectively control said reproducer.

In the Weiss system, the subscriber receives a desired program by setting a series of manually controlled switches in his receiver attachment to specific decoding positions which he is advised are necessary for that program and depositing the sum of money established as the charge for the program in a coin box. The picture signal is made unusable by nonsubscribers by transmitting the synchronizing signals necessary to reproduce the picture in a coded form not effective in a regular receiver but subject to decoding by subscribers in a manner not requiring a specific discussion here.

It is the treatment of the sound signal that Weiss relies on particularly for support of the counts. In addition to providing the regular program sound signal at the transmitter, Weiss also provides an unintelligible or nonsense sound signal. He further provides two audio or sound transmission channels A and B. Coding is achieved by switching the program sound and the nonsense sound randomly between channels A and B during vertical drive intervals of the transmitted signal so that program sound is on channel A when nonsense sound is on channel B and is on channel B when nonsense sound is on A. This switching is accomplished in response to signals from a randomly operated cyclic counter which is advanced both in response to pulses from a random pulse generator and outputs from a decimal counter. The circuit includes plugs or switches which are adjustable to different positions to select different coding schedules for different programs.

The outputs of the cyclic counter and the decimal counter, as coded by the adjustable switches, are also used to select, during vertical drive time, one of two tone signals $T_1$ and $T_2$ of different frequencies. These signals $T_1$ and $T_2$ are included in the output of the transmitter along with the composite signal including the coded video signals.

Unauthorized listeners tuning to Weiss's transmitting station get no intelligible sound because of the rapid random switching of the program and

nonsense sound between the channels A and B. The equipment provided Weiss's subscribers, on the other hand, has decoding switches which, when set according to instructions for the particular program, result in the receiver speaker being switched back and forth between channels A and B in step with the switching at the transmitter to continuously impose the program sound on the speaker.

The manner in which decoding of the sound signals in the receiver is accomplished by Weiss is best considered in connection with his Figure 13 reproduced in pertinent part below:

FIG. 13.

[A1695]

This figure shows a counting circuit including a glow discharge tube 1258 and associated multiposition switches 1280 and 1282 in cooperative arrangement with a coin box 1224, which latter is associated with a multiposition switch 1256. The glow discharge tube is connected to an input circuit which is supplied from signals $T_1$ and $T_2$ so that energization of contacts $K_1$ to $K_{10}$ is under control of the coding pattern selected at the transmitter. Switch arm 1256 is to be adjusted to a position corresponding to the price which the subscriber is advised is being charged for the program and switches 1280 and 1282 are to be adjusted to positions determined by the coding of the transmitter and of which the subscriber has also been advised. As the result of the settings of arm 1256 and arms 1280A and 1282A of switches 1280 and 1282, respectively, and the cyclic operation of the counting tube, a signal pulse is produced at either one input terminal of AND gate 310 or one terminal of AND gate 314. The other input to these AND gates is the $T_2$ signal and $T_1$ signal, respectively, in rectified form. When there is a coincidence of input signals at AND gate 310, flipflop circuit 312 is actuated to one of its two stable conditions (set) and, when there is a coincidence of inputs at AND gate 314, flipflop 312 is operated to the other stable condition (reset). The flipflop 312 controls switch circuit 316 to

connect one of the two audio channels A and B to the switch output circuit when the flipflop is in set position and the other channel to the output circuit when the flipflop is in reset position. The switch output circuit is connected through circuitry not shown to the speaker or sound reproducer. When the switch arms 1256, 1280A and 1282A are all set to the proper adjustments corresponding to the coding for the program being transmitted, the AND gates and flipflop actuate the switch circuit 316 between its two positions at such times that whichever of the channels A and B carries program sound at any instant is connected at that time to the output circuit of the switch.

The board treated the appealed counts in three different groups corresponding to different aspects of the issue of whether Weiss has adequate support for them. A first group, including count 8, which was considered in detail, and counts 1, 9, 11–13 and 16, which were found to have similar requirements to count 8, were held unsupported by Weiss. Counts 2, 6 and 7 were treated as a second group in reaching the conclusion that they too were not supported by Weiss. Finally, the board found counts 15 and 17 to be supported by Weiss. As to these last two counts only, the board considered Roschke's alternative contention that the counts are supported by the earlier filed Roschke '274 patent if construed broadly enough to be supported by Weiss and held that these counts are not supported by the '274 patent.

It is the position of Weiss that the counts on appeal are directed so broadly to the concepts of the invention of the Roschke involved patent that they are also satisfied by the Weiss application. Weiss also takes the position that the board was correct in finding that counts 15 and 17 are not supported by the Roschke '274 patent.

Roschke urges that the inventions of his involved patent and the Weiss application are different in substance "and hence without possibility of interference

in fact." He states that the board incorrectly applied a "verbal approach to claim construction" and that, though it reached what he regards as the right results as to the counts awarded him, it did so for the wrong reason. Referring to McCutchen v. Oliver, 367 F.2d 609, 54 CCPA 756 (1966); Hall v. Taylor, 332 F.2d 844, 51 CCPA 1420 (1964); and In re Draeger, 150 F.2d 572, 32 CCPA 1217 (1945), Roschke urges that the key question in determining whether a count is supported by the disclosure of an application in which it is copied is whether the disclosure teaches the gist of the invention. On that basis, Roschke takes the position that Weiss does not support any of the counts. Finally, Roschke contends that the board additionally erred in finding that counts 15 and 17 were not supported by the Roschke '274 patent if interpreted as broad enough to be supported by Weiss.

■■■ While it is true that reference to the gist of the invention has sometimes been found useful in connection with the interpretation of ambiguous expressions in determining the question of support for counts copied from patents, it is clear that the basic consideration in such determinations is what the language of the counts defines as the invention. Thus, it is a well-recognized rule that a count copied from a patent is to be construed as broadly as the language will reasonably permit. Long v. Young, 159 F.2d 766, 34 CCPA 871 (1947); Daley v. Wiltshire, 293 F.2d 677, 49 CCPA 719 (1961). All limitations in a copied count must be considered material in determining right to make. Segall v. Sims, 276 F.2d 661, 47 CCPA 886 (1960); Smith v. Wehn, 318 F.2d 325, 50 CCPA 1544 (1963). Only in the case where the count is ambiguous should resort be had to the patent in which it originated to determine its meaning. Long v. Young, supra; Smith v. Wehn, supra.

In the present case, we find no ambiguity as to count 8 and counts 1, 9, 11–13 and 16, which the board grouped with it. Turning specifically to count 8, the

board noted that Weiss relied on his switch circuit 316 and the actuating flip-flop 312 as the "signal-translating device having a plurality of operating conditions," and the "means * * * to actuate said signal-translating device to said predetermined operating condition * * *," respectively, of its two last-recited elements. The board acknowledged that the switch 316 has "a plurality of operating conditions" but further stated:

> However, the requirement,
>
>> * * * a predetermined one of which conditions represents a correct correlation status between the adjustment of said code-determining elements and said code pattern;
>
> requires that the device in question remain in a single operating condition which remains unchanged so long as the code-determining elements are correctly set. This is clearly not true of the Weiss device where the decoding function is performed by switching back and forth between the two possible conditions in accordance with a time schedule. The variable here is not one condition or the other as the count requires, but rather the times at which changes between channels are made. In our opinion the determination of the time of switching between conditions is not properly termed an operating condition of the device. It is therefore clear that the Weiss reissue application does not support count 8 * * *.

Weiss contends that his application supports these counts, urging that operation of switch 316 between positions connecting channels A and B to its output "in phase" with the switching of program sound between the two channels in the transmitter is one condition which "represents" a correct correlation status between the adjustment of the code-determining elements and the code pattern. He further urges that operation of the switch "out of phase" with the switching of program sound between the two channels is "another" condition.

In taking that position, Weiss ignores the requirement of count 8 that a "predetermined one" of the conditions of the signal-translating device represents a correct correlation status between the adjustment of the code-determining elements and the code pattern. The fact is that the signals impressed on the input of Weiss's switch 316 are deliberately made random in time through the use of a random signal generator in the transmitter as a link in determining the occurrence of the switching of program sound and nonsense sound to channels A and B and the occurrence of tone signals $T_1$ and $T_2$. Thus the operation of the switch 316 that results in proper decoding amounts to changing from one state to another in a random, unpredictable and ever-changing manner. Hence there is no previously established or "predetermined" *one* condition of the switch 316 that represents a correct correlation of the adjustment of the code-determining elements and the code pattern. We accordingly agree with the board that count 8 and counts 1, 9, 11–13 and 16, which have requirements similar to count 8, are not supported by Weiss.

Turning to count 6, the board gave particular consideration to the last two clauses [2] in the count and concluded from them that the count:

> * * * clearly sets out that a control effect must be derived which is indicative of correct adjustment and a use of that effect to allow operation of the reproducer only when a comparison of previously specified signals indicates a correct correlation * * *.

The board further stated:

> We are firmly of the opinion that this requirement is not met by the switch circuit 316 of Weiss since that device transmits a signal to the reproducer at all times. Selectively permitting operation as disclosed in the Roschke

---

2. The last clause recites "means * * * to permit said reproducer to operate only during intervals of correct correlation of said schedules."

patent involved is a different thing from merely changing channels as in Weiss and we are of the opinion that limitations such as that quoted above from count 6 are a reasonably clear definition of that difference so that the Weiss reissue application does not support count 6 or other counts which include a similar limitation. This includes counts 2 and 7. Roschke is therefore entitled to an award as to these counts also. It is noted further that count 2 is more limited than others of this group in specifying that the derived control effect have "one predetermined value" during proper correlation and otherwise another value, and that the reproducer is permitted to respond only while the "control effect has said one value". The failure of the Weiss disclosure to include such a feature is even clearer as to this count.

Weiss contends that what is meant by reference to permitting the signal reproducer to operate only during intervals of correct correlation is that "during that time it receives intelligible signals and permits an understandable program" and that, when there is no control effect, "the reproducer will receive either unintelligible signals, or no signals." He also urges:

> When the control effect is not present or there is an incorrect control effect, the Weiss *et al.* transducer is as inoperative as the Roschke transducer *in that no intelligible program is reproduced.* [Emphasis supplied.]

We do not agree with this interpretation which Weiss advances as the basis for finding support for count 6 in his application. Rather, we think the board was correct in finding the significance

of the subject recitations in the count to be that the received signal is allowed to operate the reproducer only when the signal is correctly decoded in contrast to being allowed to operate it irrespective of proper decoding.

Although the preceding is based on the premise that count 6 is not ambiguous and resort to the Roschke patent for interpretation is not in order, our conclusion would be the same if the count were deemed to require interpretation in light of Roschke where it originated. Thus, that patent not only discloses that the intelligence signals may be disconnected from the reproducer until correct correlation is attained but also emphasizes that operation,[3] as in the following exemplary passages from the specification:

> Another and distinctly different aspect of subscription television which is aided materially by the subject invention has to do with defeating, or making more difficult the task of those who would cheat the system by trial and error techniques. It will be appreciated that where a decoding device includes a number of adjustable elements to be set relative to one another in order to achieve decoding, there is at least a temptation to find the rosetta stone or correct setting of the decoder on a trial and error basis. Of course, if this effort should be successful, a subscriber would succeed in avoiding the obligation to make a payment for enjoying the subscription program. Trial and error adjustment of the decoder is not at all an easy task but it is suspected that the burden may possibly be eased through the observation of changes occasioned in the reproduced image as the trial and error process is pursued step by step. Should any help be derived from ob-

---

3. Roschke additionally states in his brief: Roschke's central idea is the desirability of *monitoring* the adjustment of the receiver decoding switches and allowing the conventional receiver circuits—such as the decoders, the picture tube, and the loud speaker—to function *only* when the receiver switches "pass" the correlation test.

> It is also to be noted that Roschke contemplates that the decoding switch settings for the various programs may be given out only to subscribers who have agreed to pay for them, in contrast to Weiss's making the settings available to all.

servation of the image, cheating may be made more difficult by arranging that the image shall not appear on the screen unless and until the decoding device has been conditioned as required to effect complete decoding. This objective is also realized through the present invention.

\* \* \* \* \* \*

It is another object of the invention to provide a subscription television receiver having sound and image reproducers at least one of which is effectively disabled unless and until those elements of the receiver which are to be precisely adjusted in accordance with the requirements of a given subscription program have, in fact, been so adjusted.

■ Count 6 and count 2, which is more limited than count 6 as pointed out in the above quotation from the board's opinion, therefore were correctly held not supported by Weiss.

Although count 7 does not include precisely the same terminology as counts 2 and 6, it does recite:

\* \* \* means for deriving a first signal representing the decoding schedule of said mechanism; means responsive to said components of said carrier-wave signal for deriving a second signal representing the coding schedule of said coded signal; means for effectively comparing said first and second signals to derive a control effect representing the state of correlation of said schedules \* \* \*.

■ In awarding counts 3 and 4, on which no appeal was taken, to Roschke, the board stated:

The decoding schedule of the decoding mechanism of Weiss is determined by the setting of both switch arms [1280A and 1282A] and a signal delivered by either arm alone cannot be said to be representative of the setting of the other, and hence is not representative of the decoding schedule as required. The two signals together (considering both selector arms) col-

lectively could be said to be so representative, but we consider that it would be improper to regard two distinct signals appearing at different locations in the apparatus to be "a first signal" \* \* \*.

That reasoning is fully applicable to count 7 where the recitation of means for deriving "a first signal representing the decoding schedule of said [decoding] mechanism" is not supported by Weiss. Therefore, the board did not err in awarding count 7 to Roschke.

In holding that counts 15 and 17 are supported by Weiss, the board first held that the "combination signal" comprising $T_1$ and $T_2$ of Weiss is so generated in the coding apparatus that the sequence of tone signals transmitted and received is "representative" of the coding in that system.

It further stated:

\* \* \* count 17 provides that the specified signal generating apparatus merely *includes* a plurality of adjustable code-determining elements and is further broadened in not requiring that the comparison signal represent the setting of the entire mechanism, but only that it have a characteristic which is determined at least partially by the setting of said code-determining elements.

We consider that this broad provision is satisfied by considering switch arm 1280A and 1256 as the plural code-determining elements, noting that the term "include" emphasized above does not exclude the presence of other elements such as 1282A. The signal on switch arm 1280A is "at least in part" determined by the instantaneous adjustment of 1280A and 1256 and thus satisfies the broad requirement of count 17. \* \* \*

Count 15 is broader than 17 in merely providing for means for comparing the adjustment of the code-determining elements with the given code pattern without requiring that the comparison be accomplished by any particular signals. We think it

clear that such a comparison is achieved by the Weiss apparatus.

Roschke states that these counts describe apparatus fed simultaneously with two signals, "one representing the transmitter coding pattern (i. e., the transmitter coding switch settings) and the other representing the settings, at the moment, of the receiver coding switches." He urges the first signal does not exist in Weiss because no transmitted signal there represents the transmitter code pattern. He further contends that the second signal is not provided because Weiss discloses "no one signal, in any part of their system, that is definitive of the receiver coding-switch settings * * *."

■ As Weiss points out, however, the $T_1$ or the $T_2$ tone of his invention is "generated at the transmitter only when a predetermined signal is applied to the coding device at the transmitter from the circuitry which drives it," and the $T_1$ and $T_2$ tones thus have a characteristic which represents the code pattern. As to count 15, which does not specify that the "means for * * * comparing" be actuated by any particular signals, the board thus was correct in its reasoning that Weiss has adequate support.[4]

■ On the other hand, count 17 includes a recitation of signal-generating apparatus for developing "a comparison signal having a characteristic determined, at least in part, by the instantaneous adjustment of said code-determining elements." That recitation, by itself, is quite broad. However, the count includes the further requirement that the means for comparing the instantaneous adjustment of the code-determining elements with the predetermined adjustment (which represents correct decoding) to provide the control effect for the reproducer is "responsive" to that "comparison signal." Weiss's circuitry, which requires *two* comparison signals, from switch arms 1280A and 1282A, respectively, therefore does not meet the combined requirement for apparatus for developing *a* comparison signal and "comparing" means which is "responsive" to that comparison signal to provide the recited control effect. The board thus erred with respect to count 17.

Our finding that Weiss does support count 15 requires consideration of Roschke's contention that his earlier filed '274 patent supports this count. The subscription television system of that patent utilizes randomly-occurring coding signals $f_1$ through $f_6$ established by a code signal generator in cooperation with a transposition coding mechanism including adjustable switches. One of these signals, as $f_6$, is derived and applied to the receiver circuitry separately from the other five signals but the board found no basis for holding that it represents a code pattern as defined in the count.

Roschke's argument primarily is that neither Weiss nor Roschke '274 really supports the count, but if Weiss does, so does Roschke '274. That argument is not particularly helpful since the Weiss and Roschke '274 circuits are decidedly different. Thorough review of the entire record in light of the arguments leaves us unsatisfied that the receiver of Roschke '274 derives a code signal "having a characteristic representing" the code pattern at the transmitter, a feature that the board also found lacking. Roschke thus has failed to meet his burden of convincing us that the board erred in its decision as to count 15, and that decision must be sustained. See Daley v. Wiltshire, supra.

The decision is affirmed as to counts 1, 2, 6–9, 11–13 and 16 (No. 8290) and count 15 (No. 8322) and is reversed as to count 17 (No. 8322).

Modified.

---

4. Since Roschke questions whether what the board termed the "combination signal" made up of $T_1$ and $T_2$ "represents" the coding pattern but does not specifically raise a question whether it is "a" code signal, the latter matter is not in issue on the record before us.